PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 11-4292

NICHOLAS GEORGE

v.

WILLIAM REHIEL, PHILADELPHIA POLICE OFFICER,
IN HIS INDIVIDUAL CAPACITY; EDWARD RICHARDS,
PHILADELPHIA POLICE OFFICER, IN HIS
INDIVIDUAL CAPACITY; JOHN DOE 1, JOHN DOE 2
AND JOHN DOE 3, EMPLOYEES OF THE
TRANSPORTATION SECURITY ADMINISTRATION, IN
THEIR INDIVIDUAL CAPACITIES; JOHN DOE 4 AND
JOHN DOE 5, PHILADELPHIA POLICE DEPARTMENT
DETECTIVES, IN THEIR INDIVIDUAL
CAPACITIES; UNITED STATES OF AMERICA

John Does 1-5,
Appellants

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civ. No. 10-cv-00586)
District Judge: Hon. Edmund V. Ludwig

Before: McKEE, *Chief Judge*, JORDAN and VANASKIE,
*Circuit Judges*

Argued: October 5, 2012

(Opinion filed: December 24, 2013)


MARK B. STERN, ESQ.
DOUGLAS N. LETTER, ESQ.
SHARON SWINGLE, ESQ.  (Argued)
Attorneys, Appellate Staff
Civil Division

Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530-0001
*Attorneys for Appellants*

ZACHARY KATZNELSON, ESQ. (Argued)
MITRA EBADOLAHI, ESQ.
BENJAMIN E. WIZNER, ESQ.
LEE B. ROWLAND, ESQ.
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

MARY CATHERINE ROPER, ESQ.
American Civil Liberties Union Foundation
of Pennsylvania
P.O. Box 40008
Philadelphia, PA 19106

DAVID RUDOVSKY, ESQ.
Kairys, Rudovsky, Messing & Feinberg, LLP
718 Arch Street
Suite 501 South
Philadelphia, PA 19106
*Attorneys for Appellee*

OPINION

McKEE, *Chief Judge*.

This appeal arises from a suit against five Federal Officials, three of whom were employed by the Transportation Security Administration ("TSA")[1], and two of whom were employed by the Federal Bureau of Investigation and who were assigned to the FBI's Joint Terrorism Task Force ("JTTF").[2] They appeal the district court's denial of their Fed.R.Civ.P. 12(b)(6) motions in which they asserted that they were entitled to qualified immunity against Nicholas George's claims that they violated his Fourth and First

---

[1] John Does 1 and 2 and Jane Doe 3.
[2] John Does 4 and 5.

2

Amendment rights during the course of an airport screening at the Philadelphia International Airport.[3]  For the reasons that follow, we conclude that the federal defendants are entitled to qualified immunity and will reverse the district court's denial of their motion to dismiss.

## I. FACTS

According to the allegations in his amended complaint,[4]  on August 29, 2009, Nicholas George, a 21-year old citizen of the United States, was scheduled to fly from Philadelphia, Pennsylvania, to California to begin his senior year at Pomona College.  George claims that after he arrived at the Philadelphia International Airport, he was detained, interrogated, handcuffed, and then jailed, in violation of his Fourth and First Amendment rights, because he was carrying a deck of Arabic-English flashcards and a book critical of American interventionism.

When he arrived at the Airport, George presented his boarding pass and showed TSA Officials valid identification. He was then asked about the contents of his carry-on bag, and he told a TSA screening Official that it contained two stereo speakers.  He was asked to remove them so that they could be separately screened by x-ray.  After George walked through the screening device, a TSA Official told him to enter a glass-enclosed area for additional screening.  George did so and another TSA Official ("John Doe 1") told him to empty his

---

[3] Pursuant to a stipulated protective order entered in the district court, the three TSA employees named as individual defendants were named as John Does 1-2 and Jane Doe 3, and were identified under seal.  The two individual defendants alleged in the complaint to be "detectives of the Philadelphia Police Department," were identified in preliminary discovery to be FBI Agents with the JTTF.  Those two individual defendants have been designated John Does 4-5 pursuant to the stipulated protective order.

[4] In reviewing a denial of qualified immunity at the Rule 12(b)(6) stage of litigation, we must accept all plaintiff's allegations as true and draw all inferences in his or her favor. *Torisky v. Schweiker*, 446 F.3d. 438, 442 (3d Cir. 1991).

pockets.  George complied and handed over a set of approximately 80 handwritten Arabic-English flashcards.

George contends that the flash cards included words commonly used in contemporary Middle Eastern publications and electronic media.  He claims that he had them because he was trying to become sufficiently proficient in Arabic to be able to read and understand discussions in contemporary Middle Eastern media.  The flashcards included every day words and phrases such as "day before yesterday," "fat," "thin," "really," "nice," "sad," "cheap," "summer," "pink," and "friendly."  However, they also contained such words as: "bomb," "terrorist," "explosion," "attack," "battle," "kill," "to target," "to kidnap," and "to wound."

George had a double major in Physics and Middle Eastern Studies and had traveled to Jordan to study Arabic as part of a study abroad program organized by the Council on International Educational Exchange.[5]  He acknowledges that after completing his program – for which he received course credit at Pomona College – he spent approximately five weeks traveling in Ethiopia, Egypt and Sudan.  He travelled there as a tourist and to practice his Arabic.[6]

After seeing the flashcards, John Doe 1 took George to another screening area where Doe 1 and a second TSA screener ("John Doe 2") swabbed George's cell phone for explosives, and searched his carry-on items.  Either John Doe 1 or John Doe 2 then telephoned a supervisor, Jane Doe 3, and she arrived at the screening area within 30 minutes.

George claims that upon her arrival, Jane Doe 3 subjected him to aggressive interrogation and detained him for an additional 15 minutes.  When asked about his flashcards, George explained that he was using them to learn Arabic vocabulary.  He submits that the interrogation included the following exchange:

**Jane Doe 3:**  You know who did

---

[5] The Council is a non-profit U.S. organization founded in 1947.

[6] It does not appear that George was questioned about his travels by the TSA Officials.

4

9/11?

**George:** Osama bin Laden.

**Jane Doe 3:** Do you know what language he spoke?

**George:** Arabic**.**

**Jane Doe 3:** Do you see why these cards are suspicious?

Jane Doe 3 also commented about one of his books entitled, "Rogue Nation: American Unilateralism and the Failure of Good Intentions." The book was critical of United States foreign policy. However, in responding to Jane Doe 3's questioning, George insists that he made no threatening statements, and that he neither said nor did anything that would lead a reasonable government official to regard him as a threat.

As Jane Doe 3 was in mid-sentence questioning George, William Rehiel, a Philadelphia Police Officer, arrived at the airport screening area. Rehiel immediately handcuffed George and led him through the Terminal and down a set of stairs to the Airport Police Station in the plain sight of other passengers. Upon arriving there, he was locked in a cell for more than 4 hours. He remained in handcuffs for the first two hours of that detention.

Philadelphia Police held George for further questioning by two FBI Joint Terrorism Task Force ("JTTF") Officials, "John Doe 4" and "John Doe 5." However, no Philadelphia Police officers questioned him or took any meaningful steps to investigate whatever suspicions they may have had while he was confined. Furthermore, no one told George why he was being held. Rather, the Philadelphia Police called the JTTF Officials for them to evaluate whether he was a threat.

When the JTTF Officials finally arrived, they searched his carry-on belongings, and then escorted him out of his cell to a room where they interrogated him for 30 minutes. They

5

questioned him about his personal and religious beliefs, travel, educational background, and political and social associations, e.g., whether he was a member of "pro-Islamic" or "communist" groups on campus, or whether he met anyone during his travels who was overtly against the U.S. government.

After about 30 minutes of questioning, the JTTF Officials told George that the Philadelphia Police called them to evaluate whether he was a real threat, that they (the JTTF Officials) had concluded that he was not a threat, and that he was free to leave. Thus, more than five hours after his ordeal began, he was released from custody. George claims that he was not free to leave at any time before the JTTF Officials allowed him to go, and he was not advised of his rights, allowed to make a phone call or contact an attorney before then.

The following day, George returned to the airport and boarded a flight that took him to his destination without further incident.

## II. DISTRICT COURT PROCEEDINGS

George filed a complaint and an amended complaint in the district court asserting a *Bivens'* action against the three TSA Officials and the two JTTF Officials.[7, 8] The amended

---

[7] In *Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics*, 403 U.S. 388, 397 (1971), the Supreme Court held that federal officers who acted under color of law were liable for damages caused by their violations of a plaintiff's Fourth Amendment rights. Pursuant to *Bivens*, "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of money damages against the responsible federal official." *Butz v. Economou*, 488 U.S. 478, 504 (1978).

[8] George also asserted claims against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), and against two Philadelphia Police officers, Rehiel and Edward Richards, who George alleges was the duty sergeant for at

complaint alleges that the individual Federal Officials subjected him to an unreasonable search and seizure in violation of his Fourth Amendment rights, and that they detained him in retaliation for his possession of Arabic-language flashcards and the content of a book he was carrying, in violation of his First Amendment rights.

As we noted at the outset, the TSA and JTTF Officials filed motions to dismiss the *Bivens*' claims pursuant to Fed.R.Civ.P. 12(b)(6). They argued that George's allegations did not establish a constitutional violation, and that even if he had adequately pled such a violation, they were entitled to qualified immunity because the underlying constitutional rights were not so clearly established at the time of his detention to deprive them of that defense.

The district court denied the motions to dismiss explaining that "the amended complaint alleges claims for relief that are 'plausible on [their] face.'Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (U.S. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007))." The individual Federal Officials filed an appeal from the denial of their Rule 12(b)(6) motions and an unopposed motion for clarification in which they asked the district court to confirm its intent to reject their assertion of qualified immunity.

In response, the district court further explained that the amended complaint "contains sufficient factual allegations of specific conduct on the part of each defendant that, if true, constitute violations of plaintiff's First and Fourth Amendment rights." The Court further explained:

> The procedures employed by the defendants, as alleged here, do not appear to have been minimally designed to protect plaintiff's personal privacy and individual liberty rights. The TSA's statutory and regulatory authority

---

least part of the time he was detained by the Philadelphia Police, under 42 U.S.C. § 1983. However, those claims are not before us in this appeal.

7

appears to have been exhausted after the first 10-15 minutes, once plaintiff was found to possess nothing that would endanger airline safety. Moreover, an investigatory detention and arrest are constitutional only if supported by reasonable suspicion of criminal activity or probable cause of a specific crime. Here, the amended complaint does not provide a reasonable inference of individualized suspicion or probable cause for the prolonged detention and arrest of plaintiff.

If the facts alleged are true, the TSA's seizure of plaintiff amounted to an investigatory detention, which escalated to an arrest when the [Philadelphia Police Department] handcuffed and locked him in a cell at the direction of the TSA and JTTF. Accordingly, the amended complaint adequately alleges that each individual defendant participated in subjecting plaintiff to an intrusion upon his personal freedom for more than five hours. There were no grounds for reasonable suspicion of any criminality or probable cause. Early on, it was determined that he posed no threat to airline safety.

Joint Appendix (JA) 84-85 (citations omitted).

The court explained its refusal to dismiss George's First Amendment claim as follows:

The amended complaint also plausibly sets forth a First

8

Amendment violation. Except for certain narrow categories, "all speech is protected by the First Amendment." The "right to receive information and ideas" is also well-established. To proceed on the retaliation claim, plaintiff must plead "(1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation."

The factual matter contained in the amended complaint suggests that the entirety of plaintiff's airport experience may fairly be attributable to his possession of materials protected by the First Amendment. Plaintiff was "jailed for several hours . . . solely because he passed through an airport screening checkpoint with a set of Arabic-English flashcards and a book critical of American foreign policy." Am. Compl. ¶ 1. TSA screeners inspected the flashcards and one screener "flipped through the pages of books that Mr. George had" and the other screener discussed the flashcards with their supervisor. Id. ¶¶ 27-29. The TSA supervisor questioned plaintiff because the flashcards were "suspicious." Id. ¶¶ 37-39. "After noticing the book, the TSA supervisor continued her hostile and aggressive questioning . . . ." Id. ¶¶ 36-37. The amended complaint adequately alleges that each defendant violated plaintiff's

9

right to read, study and possess protected materials by arresting and detaining him for his exercise of those rights.

JA 86 (certain citations omitted).

The court also explained that the individual Federal Officials' assertion of qualified immunity, "may be clarified by discovery." JA 87.

The Federal Officials then filed this appeal from the district courts' October 28, 2011, Order.[9]

## III. APPELLATE JURISDICTION AND STANDARD OF REVIEW.

Before addressing the merits, we must first determine whether we have jurisdiction. *See In re Flat Glass Antitrust Litig.*, 288 F.3d 83, 88 n.5 (3d Cir. 2002) (quoting *In re Ford Motor Co.*, 110 F.3d 954, 958-59 (3d Cir. 1997) (We "have an 'independent responsibility to examine our own jurisdiction sua sponte.'").[10]

The district court denied the individual Federal Officials' Rule 12(b)(6) motions to dismiss, "because the amended complaint alleges claims for relief that are 'plausible on [their] face.'" Apparently unsure about whether the district court was rejecting the defendant's assertion of qualified immunity, the individual Federal Officials filed an unopposed motion for clarification.

In response to the motion, the district court stated that George's amended complaint "contains sufficient factual allegations of specific conduct on the part of each defendant that, if true, constitute violations of plaintiff's First and

---

[9]We treated this as an Amended Notice of Appeal.

[10] The Clerk of this Court initially entered an order stating that the appeal was not taken from a final order and asking the parties to address this Court's jurisdiction. Following the parties' response to that Order, the Clerk referred the jurisdictional issue to this merits panel.

Fourth Amendment rights." The court also concluded that the individual federal defendants' assertion of qualified immunity "may be clarified by discovery."

After a review of the parties' initial submissions and their briefs, it is clear that we have jurisdiction over this appeal.

"Ordinarily we do not have jurisdiction to review district court orders denying motions to dismiss . . . because there is no final order within the meaning of 28 U.S.C. § 1291." *Acierno v. Cloutier*, 40 F.3d 597, 605 (3d Cir. 1994) (citation omitted). However, in *Ashcroft v. Iqbal*, 556 U.S. 662, 672-675 (2009), the Supreme Court held that a district court order denying a motion to dismiss based on qualified immunity is appealable under the collateral order doctrine.

Here, however, the district court did not specifically engage in the traditional qualified immunity analysis before denying the individual federal defendants' motions to dismiss. Rather, as noted, in its order addressing the individual federal defendants' motion for clarification, it simply said the "defense of qualified immunity in this case may be clarified by discovery." However, in that same order the district court held that the amended complaint stated a valid claim against each federal defendant for violation of the First and Fourth Amendments. Thus, because the district court held that the amended complaint sufficiently pled valid constitutional claims against the individual federal defendants, the practical effect of the district court's order was a denial of the defense of qualified immunity. Accordingly, we will regard that order as an appealable collateral order.

> Where the district court bases its refusal to grant a qualified-immunity motion on the premise that the court is unable, . . . or prefers not to, determine the motion without discovery. . ., that refusal constitutes at least an implicit decision that the complaint alleges a constitutional claim on which relief can be granted. That purely legal decision does not turn on whether the plaintiff can in fact elicit any evidence to support his allegations; it thus possesses the requisite finality for immediate appealability

11

> under the collateral order doctrine. . . . A district court's perceived need for discovery does not impede immediate appellate review of the legal questions of whether there is a constitutional right at all and, if so, whether it was clearly established at the time of the alleged conduct, for until these threshold immunity questions are resolved, discovery should not be allowed.

*X-Men Security, Inc. v. Pataki*, 196 F.3d 56, 66 (2d Cir. 1999) (citations, internal quotation marks and brackets omitted).

The Supreme Court has repeatedly "stressed the importance of resolving [qualified] immunity questions at the earliest possible stage of the litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Thus, district courts should move "expeditiously to weed out suits . . . without requiring a defendant who rightly claims qualified immunity to engage in expensive and time-consuming preparation to defend the suit on the merits." *Seigert v. Gilley*, 500 U.S. 226, 232 (1991). Qualified immunity is not merely a defense, but also "an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). Accordingly, "any claim of qualified immunity must be resolved at the earliest possible stage of the litigation." *Miller v. Clinton County*, 544 F.3d 542, 547 (3d Cir. 2008).

"We exercise de novo review of a district court's denial of a motion to dismiss on qualified immunity grounds as it involves a pure question of law." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (citation omitted). In reviewing a denial of qualified immunity at the 12(b)(6) stage of litigation, we must accept plaintiff's allegations as true and draw all inferences in his or her favor. *Torisky v. Schweiker*, 446 F.3d 438, 442 (3d Cir. 2006).

## IV. THE QUALIFIED IMMUNITY DOCTRINE.

Qualified immunity shields government officials from personal liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

12

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine is intended "to mitigate the social costs of exposing government officials to personal liability," *Farmer v. Moritsugu*, 163 F.3d 610, 613 (D.C. Cir. 1998), by giving officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074, 2085 (2011). Properly applied, it protects "all but the plainly incompetent or those who knowingly violate the law." *Id*. (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Determining whether a right alleged to have been violated is so clearly established that any reasonable officer would have known of it "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citation and quotation marks omitted). In order for the official to lose the protections of qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Al-Kidd*, 131 S.Ct. at 2083.

Because a government official may only be held personally liable under *Bivens* "for his or her own misconduct," the plaintiff must allege that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Accordingly, in order to overcome the defense of qualified immunity here, George must allege facts showing that the conduct of each individual federal defendant (1) "violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Al-Kidd*, 131 S.Ct. at 2080. However, we need not undertake our inquiry in that order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

**V. DISCUSSION**

The individual Federal Officials make a number of arguments in support of their appeal. Each is discussed separately below.

**A. George's factual allegations do not establish that any individual Federal Official violated his clearly established rights under the Fourth Amendment.**

Before addressing the merits of this argument, it is first necessary to consider airport security screenings in context with the Fourth Amendment's limitations on governmental searches. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

In *United States v. Hartwell*, 436 F.3d 174 (3d Cir. 2006), we held that a warrantless airport security screening of a passenger and his baggage without individualized suspicion is tantamount to a permissible administrative search under the Fourth Amendment. There, Hartwell arrived at the Philadelphia International Airport intending to catch a flight to Phoenix, Arizona. He placed his carry-on luggage on the conveyor belt to be x-rayed, and approached a metal detector. His luggage was scanned without incident, but he set off the magnetometer when he walked through it. A TSA Officer took Hartwell aside after he passed through the metal detector a second time. The TSA Officer then used a magnetic wand to determine why Hartwell had triggered the metal detector. The wand revealed a solid object in Hartwell's pocket and the TSA Officer asked to see it. Ultimately, the TSA Officers discovered that the object was crack cocaine, and Hartwell was arrested by the police.

In his appeal following a conditional guilty plea,[11] Hartwell argued that the drugs should have been suppressed because the search violated the Fourth Amendment. We disagreed and held that the search "was permissible under the administrative search doctrine." 436 F.3d at 177 (quoting *United States v. Marquez*, 410 F.3d 612, 616 (9th Cir. 2005) ("Airport screenings of passengers and their baggage constitute administrative searches and are subject to the limitations of the Fourth Amendment.").

We began our analysis in *Hartwell* by observing that the Fourth Amendment "limits government action in two ways. First, it requires that searches and seizures be reasonable, and, second, it states that when a warrant is required – in circumstances that are not explicitly defined by the text – it must have certain characteristics." *Id.* (citation omitted). We then noted that the Supreme Court has "read the Amendment's twin commands in tandem, holding that when people have a reasonable expectation of privacy in their persons or effects, all searches and seizures must be supported by a warrant, unless they fall into one of the exceptions to that requirement." *Id.* (citation omitted). The "first step in Fourth Amendment analysis is [identifying] whether a search or seizure has taken place." *Id.* However, the government conceded that "an airport pre-boarding security screening is a search," *id.* It was therefore not disputed that Hartwell had "experienced a single, warrantless search, which was initiated without individualized suspicion" and "was not conducted pursuant to a warrant." *Id.* at 178. Thus, in order to survive a Fourth Amendment challenge, "the search must [have been] grounded in an exception to the warrant requirement." *Id.*

In concluding that "Hartwell's search at the airport check-point was justified by the administrative search doctrine," *id.*, we first explained that:

> A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. While suspicion is

---

[11] Hartwell reserved his right to appeal the denial of his suppression motion in his plea agreement.

not an "irreducible" component of reasonableness, the Supreme Court has recognized only limited circumstances in which the usual rule does not apply. These circumstances typically involve administrative searches of "closely regulated" businesses, other so-called "special needs" cases, and suspicionless "checkpoint" searches.

*Id.* (citation, brackets, footnotes and certain internal quotation marks omitted).[12] We then noted that:

Suspicionless checkpoint searches are permissible under the Fourth Amendment when a court finds a favorable balance between "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Illinois v. Lidster*, 540 U.S. 419, 427 (2004) (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

*Id.* at 178-789 (footnote omitted).

Turning to the specifics of Hartwell's search, we held that "the airport checkpoint passes the *Brown* [*v. Texas, supra*] test." *Id.* at 179. In doing so we noted the following considerations. First, "there can be no doubt that preventing terrorist attacks on airplanes is of paramount importance." *Id.* (citations omitted). Second, "airport checkpoints also advance the public interest" because "absent a search, there is no effective means of detecting which airline passengers are

---

[12] In *Hartwell*, we noted that the Supreme Court has not directly addressed the issue of airport administrative searches, but that it has discussed them in dicta in two cases. 436 F.3d at 178 n.5 (citing cases).

16

reasonably likely to hijack an airplane." *Id.* at 179-80 (citations and brackets omitted). Third, "the procedures involved in Hartwell's search were minimally invasive." *Id.* at 180 (footnote omitted).

> They were well-tailored to protect personal privacy, escalating in invasiveness only after a lower level of screening disclosed a reason to conduct a more probing search. The search began when Hartwell simply passed through a magnetometer and had his bag x-rayed, two screenings that involved no physical touching. Only after Hartwell set off the metal detector was he screened with a wand – yet another less intrusive substitute for a physical pat-down. And only after the wand detected something solid on his person, and after repeated requests that he produce the item, did the TSA agents (according to Hartwell) reach into his pocket.

> In addition to being tailored to protect personal privacy, other factors make airport screening procedures minimally intrusive in comparison to other kinds of searches. Since every passenger is subjected to a search, there is virtually no stigma attached to being subjected to a search at a known, designated airport search point. Moreover, the possibility for abuse is minimized by the public nature of the search. Unlike searches conducted on dark and lonely streets at night where often the officer and the subject are the only witnesses, these searches are made under

17

> supervision and not far from the scrutiny of the traveling public. And the airlines themselves have a strong interest in protecting passengers from unnecessary annoyance and harassment.

*Id*. (citations and internal quotation marks omitted). "[T]he entire procedure is rendered less offensive – if not less intrusive – because air passengers are on notice that they will be searched." *Id*.

> Air passengers choose to fly, and screening procedures of this kind have existed in this country since at least 1974. The events of September 11, 2001, have only increased their prominence in the public's consciousness. It is inconceivable that Hartwell was unaware that he had to be searched before he could board a plane. Indeed, he admitted that he had previously been searched before flying.

*Id*. at 181 (citations omitted).

> Based on these considerations, we concluded:

> Hartwell's search does not offend the Fourth Amendment even though it was initiated without individualized suspicion and was conducted without a warrant. It is permissible under the administrative search doctrine because the State has an overwhelming interest in preserving air travel safety, and the procedure is tailored to advance that interest while proving to be only minimally invasive. . . .

*Id*. (footnote omitted).

18

Because we held that a search pursuant to routine airport screening was constitutionally permissible under the administrative search doctrine, we found it unnecessary to address issues concerning consent-based rationales for airport searches. 436 F.3d at 181 n.11. However, we note that the Court of Appeals for the Ninth Circuit, has held that the constitutionality of an airport screening search does not depend on the passenger's purported consent. In *United States v. Aukai*, 497 F.3d 955 (9th Cir. 2007), the court held:

> The constitutionality of an airport screening search, however, does not depend on consent, and requiring that a potential passenger be allowed to revoke consent to an ongoing airport security search makes little sense in a post-9/11 world. Such a rule would afford terrorists multiple opportunities to attempt to penetrate airport security by electing not to fly on the cusp of detection until a vulnerable portal is found. This rule would also allow terrorists a low-cost method of detecting systematic vulnerabilities in airport security, knowledge that would be extremely valuable in planning future attacks. Likewise, given that consent is not required, it makes little sense to predicate the reasonableness of an administrative airport screening search on an irrevocable implied consent theory. Rather, where an airport screening search is otherwise reasonable and conducted pursuant to statutory authority . . . all that is required is the passenger's election to attempt entry into the secured area. Under current TSA regulations and

> procedures, that election occurs when a prospective passenger walks through the magnetometer or places items on the conveyor belt of the x-ray machine.

497 F.3d at 961 (citations and footnote omitted).

With this background as our analytical compass, we examine the merits of the individual Federal Officials' Fourth Amendment argument.

**1. George's factual allegations do not establish a Fourth Amendment violation.**

**(a). The TSA Officials – John Does 1-2 and Jane Doe 3.**

The TSA Officials – John Does 1 and 2, and Jane Doe 3 – submit that George's factual allegations do not establish that they violated a Fourth Amendment right. We agree.

George alleges that the two TSA screening Officials, John Does 1 and 2, inspected his Arabic-English flashcards, searched his carry-on bag, swabbed his cell phone for explosives, and that one of them contacted their supervisor for assistance. John Does 1 and 2 kept him in the side screening area for 30 minutes. Am. Compl. ¶¶ 23, 27-30. George was not handcuffed while detained in the screening area. Then, the TSA Supervisor, Jane Doe 3, arrived, and was informed about the Arabic-English flashcards. She responded by further questioning George for about 15 minutes. Amended Compl. ¶¶ 33-40. During that questioning, while Jane Doe 3 was in mid-sentence, a Philadelphia Police Officer, William Rehiel, arrived at the scene, handcuffed George and took him to the Airport Police Station. Amended Compl. ¶¶ 42-45.

In his Memorandum in Opposition to the United States' Motion to dismiss,[13] George conceded that the search

---

[13] As we have noted, *see* n.8, *supra*, George asserted claims against the United States under the Federal Tort Claims Act.

conducted by the two TSA screening Officials who searched his person and baggage "began properly" and that they acted lawfully in "conduct[ing] a thorough search of his carry-on items for weapons and explosives." Plaintiff's Memorandum in Opposition to United States' Motion to Dismiss at 2-3. However, in the district court George argued that once this search failed to discover any explosives or other hazardous weapons, John Does 1 and 2 had to release him and their failure to do so, and to instead contact their supervisor (Jane Doe 3), violated his Fourth Amendment rights.

The district court agreed, opining that the TSA screeners' authority to search and question George "appears to have been exhausted after the first 10-15 minutes, once plaintiff was found to possess nothing that would endanger airline safety." JA 84. The district court then held:

> [A]n investigatory detention and arrest are constitutional only if supported by reasonable suspicion of criminal activity or probable cause of a specific crime. Here, the amended complaint does not provide a reasonable inference of individualized suspicion or probable cause for the prolonged detention and arrest of plaintiff. . . . If the facts alleged are true, the TSA's seizure of plaintiff amounted to an investigatory detention and arrest of plaintiff.

JA 84-85 (citing *Terry v. Ohio*, 392 U.S. 1 (1968) and *Orsatti v. N.J. State Police*, 71 F.3d 480 (3d Cir. 1995). We disagree.

In *Terry*, the Supreme Court announced the general standards for a limited search pursuant to a brief investigative detention, and in *Orsatti*, we recited the general standards governing an arrest. Although neither case is definitive in the context of the Fourth Amendment parameters within which TSA officials can detain, search and question passengers at an airport security checkpoint, we did examine those limitations in *United States v. Hartwell, supra.*

---

However, as also noted, those claims are not before us in this appeal.

As discussed above, we there held that airport security screening of a passenger and his/her baggage without a warrant or individualized suspicion is permissible under the Fourth Amendment as an administrative search. In *Hartwell*, we upheld an airport screening search that involved an escalating level of scrutiny and intrusion where "a lower level of scrutiny disclosed a reason to conduct a more probing search." 436 F.3d at 180.

The Court of Appeals for the Ninth Circuit has also upheld an airport security search involving increased levels of screening. In *United States v. Aukai*, *supra*, Aukai arrived at the Honolulu International Airport to take a flight from Honolulu, Hawaii, to Kona, Hawaii. He checked in at the ticket counter but did not produce a government-issued ID. Accordingly, the ticket agent wrote "No ID" on Aukai's boarding pass.

Aukai then went to the security checkpoint, where signs advised prospective passengers that they and their baggage were subject to search. He entered the security checkpoint, placed his shoes and other items into a plastic bin and voluntarily walked through the magnetometer. The magnetometer did not signal the presence of metal as he walked through it, and nothing in his personal belongings triggered an alarm. After he walked through the magnetometer, Aukai presented his boarding pass to a TSA officer.

Pursuant to TSA procedures, a passenger who presents a boarding pass with "No ID" written on it is subject to secondary screening even though s/he has passed through the initial screening without triggering an alarm or otherwise raising suspicion. Pursuant to that policy, a TSA official passed a hand-held magnetometer or wand around Aukai's body and an item in his pocket triggered an alarm. Aukai repeatedly refused to produce the item and tried to leave. When a TSA supervisor told Aukai to empty his pocket, he again refused. The TSA supervisor then touched the outside of Aukai's pocket and concluded that Aukai had something in his pocket. Aukai eventually removed an object wrapped in tissue paper from his pocket and placed it in the tray in front of him. Fearing that the item may be a weapon, the TSA

22

supervisor summoned a nearby police officer. The TSA supervisor then unwrapped the object and discovered a glass pipe used to smoke methamphetamine. The police officer arrested Aukai and, after a search, discovered several bags of methamphetamine. Aukai was eventually taken into federal custody and admitted to illegal possession of methamphetamine after being advised of his *Miranda* rights.

Aukai was indicted for knowingly and intentionally possessing, with intent to distribute, 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A)(viii). He eventually entered a conditional guilty plea and appealed the denial of his motion to suppress the evidence that was seized pursuant to the airport search and his subsequent statement.

On appeal, the Ninth Circuit noted that it had previously held that airport screening searches are constitutionally permissible administrative searches under the Fourth Amendment. *Aukai*, 497 F.3d at 959-60 (citing cases). It then held, citing to our decision in *Hartwell*, that the search procedures to which Aukai was subjected were constitutionally permissible because they were "minimally intrusive." *Id*. at 962 (citing *Hartwell*, 436 F.3d at 180). The court of appeals also concluded that the "duration of the detention associated with his airport screening" – eighteen minutes – was "reasonable." *Id*. at 962-963. For all of these reasons, the court held that "the airport screening search of Aukai was a constitutionally reasonable administrative search." *Id*. at 963.

We believe that the conduct of the TSA Officials here was also consistent with Fourth Amendment limitations. It is not disputed that the initial airport screening to which George was subjected by the TSA Officials was a constitutionally permissible administrative search under the Fourth Amendment, even though it was initiated without individualized suspicion and was conducted without a warrant. It was not until after the TSA Officials discovered that he was carrying some handwritten Arabic-English flashcards containing such words as "bomb," "terrorist," "explosion," "an attack," "battle," "to kill," "to target," "to kidnap," and "to wound," that George was taken by John

23

Does 1 and 2 to another screening area where he was eventually questioned by Jane Doe 3. However, at that point, the Officials had a justifiable suspicion that permitted further investigation as long as the brief detention required to conduct that investigation was reasonable. *See Terry*, 392 U.S. at 21.[14]

We caution, however, that the detention at the hands of these TSA Officials is at the outer boundary of the Fourth Amendment. Once TSA Officials were satisfied that George was not armed or carrying explosives, much of the concern that justified his detention dissipated. However, it did not totally vanish or suggest that further inquiry was not warranted. Suspicion remained, and that suspicion was objectively reasonable given the realities and perils of air passenger safety. The TSA Officials still were confronted with an individual who was carrying Arabic-English flashcards bearing such words as: "bomb," "terrorist," "to kill," etc. In a world where air passenger safety must contend with such nuanced threats as attempts to convert underwear into bombs and shoes into incendiary devices, we think that the brief detention that followed the initial administrative search of George was reasonable.

Nevertheless, it is important to note that harboring views that appear to be hostile to the United States government or its foreign policy is most assuredly not, by itself, grounds for detaining someone and investigating them pursuant to the administrative search doctrine or an investigative seizure under *Terry*. However, it is simply not reasonable to require TSA Officials to turn a blind eye to someone trying to board an airplane carrying Arabic-English flashcards with words such as "bomb," "to kill," etc. Rather, basic common sense would allow those Officials to take reasonable and minimally intrusive steps to inquire into the potential passenger's motivations.

----

[14] In *Terry*, the Court reasoned: "there is no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure entails]" (internal quotation marks omitted, brackets in original).

Thus, we cannot say that it was unreasonable for John Does 1 and 2 to *briefly* continue George's seizure to consult with a supervisor. As noted above, 15 minutes after the supervisor (Jane Doe 3) arrived, and while she was in mid-sentence of a conversation with George, Officer Rehiel of the Philadelphia Police Department arrived, placed George in handcuffs and took him away. At that point, the rather brief detention that arose from the initial administrative search ended. As we explain below, despite George's failed attempt at establishing an agency relationship, none of the TSA Officials played any further role in the protracted seizure that followed.

Thus, the actions of the TSA Officials corresponded to the level of concern raised by the flashcards.[15] As we have already observed, an airport security search may become more invasive when "a lower level of screening disclose[s] a reason to conduct a more probing search." *Hartwell*, 463 F.3d at 180. Indeed, we think that these TSA Officials would have been derelict in their duties had they simply ignored the flashcards.[16]

---

[15] Admittedly, some of the Arabic-English flashcards also contained harmless, everyday words. However, we do not think that the presence of the flashcards containing innocuous words mitigates the presence of the cards containing threatening and violent words. We appreciate that George was studying Arabic and claimed to have these items to advance his study of Arabic language, culture stories in Arabic media and literature. The TSA Officials did not have to accept that explanation and allow him to board an airplane without any further inquiry. Rather, it was reasonable for them to make additional inquiries and to consult with a supervisor.

[16] We reiterate however, that this does not mean that John Does 1 and 2 could have subjected George to a lengthy detention based merely on the suspicions that arose from the words on the flashcards. Nevertheless, we cannot hold that continuing to detain George for approximately 30 minutes under the circumstances here was so unreasonable that it violated the limitations that must surround administrative searches.

Moreover, George's allegation that "he was not free to leave and believed that he was not free to leave" the screening area during the interrogation, Amended Compl. ¶ 41, does not establish that TSA Officials violated the Fourth Amendment. Indeed, in *Hartwell*, we flatly rejected the contention that a passenger has a right to leave an airport security checkpoint once the TSA officials increase the level of their screening scrutiny. We wrote:

> Hartwell argues that once the TSA agents identified the object in his pocket and he refused to reveal it, he should have had the right to leave rather than empty his pockets. We reject this theory. . . . [A] right to leave once screening procedures begin would constitute a one-way street for the benefit of a party planning airport mischief, and would encourage airline terrorism by providing a secure exit where detection was threatened.

436 F.3d at 181 n.12 (citations and internal quotation marks omitted). Airport screening is obviously informed by unique concerns and risks. Accordingly, we are reluctant to attach the same weight to the inability to leave that that may have in a different context.

We therefore do not agree with George's contention that once John Doe 1 and John Doe 2 completed their administrative search for weapons and explosives (within ten to fifteen minutes, Amended Compl. ¶¶ 27-28), without finding weapons or explosives, they had reached the parameters of a legitimate administrative search.

Under the circumstances alleged here, the Fourth Amendment was not violated by continuing this investigation even though John Does 1 and 2 found no weapons or explosives on George's person or luggage. Items other than weapons or explosives can give a TSA Screening Official reason to increase the level of scrutiny when circumstances

26

suggest that it is reasonable to conduct a more probing investigation. This does not, of course, give TSA screeners license to detain and inquire based on a mere hunch, and we certainly do not suggest that TSA screeners have a license to detain purportedly suspicious travelers for a protracted amount time. But that is not what happened here.[17]

Given the circumstances here, it was reasonable for the TSA Screening Officials to increase the level of scrutiny by briefly detaining George so that he could be further questioned in an effort to ascertain whether he posed a risk to passengers or airplane security. After the justifiable administrative search conducted by the TSA Officials, George was detained by Philadelphia Police who are not part of this appeal.

For all of the above reasons, we find that George has failed to allege facts showing that the TSA Screening Officials – John Does 1 and 2 and Jane Doe 3 – violated his Fourth Amendment rights. We therefore need not proceed to the second step of the qualified immunity analysis to determine whether that right was clearly established at the time of the challenged conduct. *See Scott v. Harris*, 550 U.S. 372, 377 (2007).

Accordingly, the TSA Screening Officials are entitled to qualified immunity on George's Fourth Amendment claim, and we will vacate the district court's order denying their motion to dismiss and remand with directions to grant the motion.

**(b). FBI Agents assigned to the JTTF – John Does 4 and 5.**

The two FBI Agents assigned to the JTTF also argue that the factual allegations in the amended complaint do not establish that they violated a Fourth Amendment right. We agree. The essence of the allegations regarding the JTTF Agents is that they went to the Airport Police Station at the request of the Philadelphia Police in order to question

---

[17] We similarly caution against detaining someone solely because of their nationality and/or choice of reading material. However, we reiterate that that is not what happened here.

27

George, searched George's carry-on luggage, and questioned him for about thirty minutes before concluding that he was not a security threat and allowing him to leave. Amended Compl. ¶¶ 63-73. The district court did not explain how or why these allegations stated a violation of the Fourth Amendment.

We are unable to find any authority that would support a finding that Federal Officials' response to a call for assistance by local police and their subsequent questioning of the subject of that call for 30 minutes constitutes a Fourth Amendment violation. Moreover, George has not provided us with any authority to support his contention that his allegations are sufficient to support a claim of a Fourth Amendment violation against the JTTF Officials.

Accordingly, we again need not proceed to the second step of the qualified immunity analysis. *See Scott*, 550 U.S. at 377. We hold that the JTTF Agents are entitled to qualified immunity and we will therefore vacate the district court's order denying their motion to dismiss and remand with directions to grant the motion to dismiss.

As we have noted, George also asserted a First Amendment claim against the individual Federal Officials. However, before beginning a discussion of that claim, it is necessary to discuss the basis for George's contention that the Federal Officials violated the Fourth Amendment by leaving him "locked in a jail cell for four hours (much of the time in handcuffs) without further investigation," that they were "directly involved in detaining [him] and instructing the local police to prolong his seizure," and that his "seizure escalated from an investigatory stop to an arrest when the local police, acting on the TSA's request, handcuffed [him], led him to the airport jail, and locked him in a cell." George is apparently contending that the individual Federal Officials are somehow liable for his purportedly unconstitutional arrest and prolonged detention by Philadelphia Police Officers. George bases that contention on his assertion that the Federal Officials had either legal or functional control over the

28

decisions and actions of the Philadelphia Police Officers.[18] The contention is meritless.

The only allegations in George's amended complaint to support this rather attenuated agency theory that the Philadelphia Police Officers were under the legal or functional control of the TSA Screening Officials are as follows:

- John Doe 1 and John Doe 2 were Transportation Security Officers of the [TSA] – commonly known as "airport screeners" – at the time of the events giving rise to this action. Each was responsible for detaining Mr. George for 30 minutes at the screening area, and, upon information and belief, they summoned the TSA Supervisor known here as Jane Doe 3, as well as the Philadelphia Police Department, for further interrogation, detention and arrest of Mr. George. . . . Amended Compl. ¶ 5

- Jane Doe 3 was an official of the [TSA] at the time of the events giving rise to this action. Upon information and belief, Jane Doe 3 held a position that involved supervising airport screeners, including Defendants John Does 1 and 2. Jane Doe interrogated Mr. George in a hostile and aggressive manner, continued his detention, and turned him over to Defendant

---

[18] As noted, *see* n.8, *supra*, George also asserted claims against the Philadelphia Police Officers pursuant to 42 U.S.C. § 1983. However, those claims are not before us in this appeal, and we take no position on the propriety of the Philadelphia Police Officers' conduct in this case.

Rehiel to be handcuffed, arrested, jailed, and further interrogated. . . . Amended Compl. ¶ 6.

The amended complaint further alleges that while George was being questioned by Doe 3, Officer Rehiel, arrived on the scene, handcuffed George and took him to the Airport Police Station without speaking to any of the Federal Officials. Amended Compl. ¶¶ 42-45. Finally, the amended complaint alleges that George's "detention, arrest, unnecessary and extended restraint, incarceration, and interrogation . . . by the Defendants, as described in [the preceding paragraphs], constituted an unreasonable search and seizure in violation of clearly established rights under the Fourth . . . Amendment[] to the United States Constitution." Amended Compl. ¶ 81.

As we have noted, in reviewing a denial of qualified immunity pursuant to a denial of a motion under Rule 12(b)(6), we must accept plaintiff's allegations as true and draw all inferences in plaintiff's favor. *Torisky*, 446 F.3d at 442. However, "a pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, at 678 (citing *Twombly*, at 557). "[T]he tenet that a court must accept as true all the allegations contained in a complaint is inapplicable to legal conclusions." *Id*.

George's allegations are an attempt to construct a theory that the Philadelphia Police Officers acted under the legal or functional control of the TSA Screening Officials. This purported agency relationship is based entirely on George's allegations that Does 1 and 2 "summoned . . . the Philadelphia Police Department, for [his] further interrogation, detention and arrest," and that Doe 3 "turned him over to [Police Officer Rehiel] to be handcuffed, arrested, jailed and further interrogated." George attempts to further weave a tapestry of inferences culminating in a conclusion of agency by contending that an arrest is the inevitable result of summoning Police and turning someone over to them.

George cites the majority opinion in *Tobey v. Jones*, 706 F.3d 379 (4th Cir. 2013), to support that contention. There, Tobey was scheduled to fly from Richmond, Virginia to Wisconsin to attend his grandfather's funeral. He waited until there was a short line at the TSA screening checkpoint and then presented his boarding pass and ID to the TSA pre-screening official. Tobey also placed his belt, shoes, sweatshirt and other carry-on items on the conveyor belt. However, TSA Official Smith diverted him from the standard screening device to the Advanced Imaging Technology ("AIT") scanning unit for enhanced screening.

Anticipating that he might be subjected to enhanced screening, Tobey had written the text of the Fourth Amendment on his chest because he believed that AIT scanning was unconstitutional.[19] Before going through the AIT unit, Tobey placed his sweatpants and t-shirt on the conveyor belt, leaving him dressed only in running shorts and socks and revealing the text of the Fourth Amendment written on his chest. Smith, the TSA Official, told Tobey that he did not need to remove his clothes. Tobey responded that he wanted to express his belief that the TSA's advanced screening procedures violated the Fourth Amendment.

Thereupon, Smith radioed for assistance. Smith's supervisor, Jones, told Smith to order Tobey to remain in front of the AIT unit. Jones and an unknown TSA Official then asked the Richmond International Airport ("RIA") Police for assistance. Tobey never refused to undergo the AIT screening and never declined to comply with any TSA request.

RIA Police Officers arrived on the scene and immediately handcuffed and arrested Tobey. None of the TSA Officials informed the RIA Police about what had occurred at the screening station and the RIA police never asked. A Police Officer escorted Tobey to a side area and told him he was under arrest for creating a public disturbance. An unknown TSA Official searched Tobey's belongings and

---

[19] This does not appear to have been particularly thoughtful, and it surely was not the least bit effective, but it certainly was creative.

removed unidentified items. A Police Officer then collected Tobey's belongings with the assistance of TSA Officials.

The RIA Police then took Tobey to the RIA Police Station where police officers questioned him and threatened him with various criminal sanctions. Tobey was eventually charged with the state crime of disorderly conduct in a public place. The police officers later released Tobey after consulting with an Air Marshal from the Federal Air Marshal's Joint Terrorism Task Force, and he boarded the plane without further incident after being held for over an hour. The county attorney subsequently dropped state criminal charges.

Tobey filed a *Bivens*' action against TSA Officials Smith and Jones and a § 1983 action against the RIA Police Officers alleging violations of his Fourth and Fourteenth Amendment rights, his First and Fourteenth Amendments rights, and his right to Equal Protection of the law under the Fourteenth Amendment. Thereafter, Smith and Jones, the TSA Officials, moved to dismiss all of the claims, asserting qualified immunity. The district court granted the TSA Officials' motion to dismiss the Fourth Amendment and Equal Protection claims. However, it did not dismiss Tobey's First Amendment retaliation claim against those officials. The Court of Appeals for the Fourth Circuit explained the district court's reasoning as follows:

> The court held that because there is a question of whether the TSA Agents in fact radioed for assistance because of the message Plaintiff sought to convey or because of some other reasonable restriction on First Amendment activity in the security area, dismissal [of the First Amendment claims] on the basis of qualified immunity would be improper.

706 F.3d at 385 (citation, internal quotation marks and brackets omitted).

32

The TSA Officials argued that Tobey had not alleged a facially valid First Amendment claim and that, even if he had, he had not alleged a violation of a clearly established constitutional right and so they were entitled to qualified immunity.

For our purposes, it is important to note that the majority in *Tobey* concluded that before it could determine if Tobey had alleged a plausible First Amendment violation, it had to "correct an erroneous conclusion reached by the district court." 706 F.3d at 385. The majority concluded that the district court had erred "in concluding that Mr. Tobey failed to plead [that the TSA Officials] in some way caused his arrest." *Id.* (citation omitted) (brackets added). The district court had concluded

> that Mr. Tobey's complaint is devoid of any facts suggesting that the [TSA Officials] – neither of whom are law enforcement officers with the power to arrest – made any such assertion or otherwise indicated to the [RIA] police that [Tobey] should be arrested.

*Id.* (citation and internal quotation marks omitted) (brackets added).[20]

Correcting what it believed to have been error, the majority stated: "[f]ortunately for Mr. Tobey, he was not required to state these precise magical words in order to plausibly plead that [the TSA Officials] caused his arrest." *Id.* (citing *Twombly*, 550 U.S. at 555). The majority then concluded:

> It is an undoubtedly natural consequence of reporting a person

---

[20] TSA Screening Officials here remind us that they lack the authority to make an arrest. *See* TSA Management Directive 1100.88-1(A) at 2. available at http://www.tsa.gov/assets/pdf/foia/TSA_MD_1100_88_1_Final_0070511.pdf (omitting security screening screeners from categories of TSA employees authorized to make arrests).

to the police that the person will be arrested; especially in the scenario we have here, where TSA and [RIA] police act in close concert. So long as Mr. Tobey's complaint rendered it plausible that [the TSA Officials] helped effectuate his arrest, the district court should have factored the arrest into its decision as to whether Mr. Tobey alleged plausible *Bivens* claims against [the TSA Officials].

*Id*. at 386 (brackets added). Later, the majority opined: "It is reasonable to infer that whatever [the TSA Officials] told [RIA] police caused Mr. Tobey's arrest." *Id*. (brackets added).

We disagree with the *Tobey* majority's conclusion that "[i]t is an undoubtedly natural consequence of reporting a person to the police that the person will be arrested." That conclusion does not appear to have been based on anything in the record. Rather, it seems to arise from the majority's personal assumptions and inferences. However, absent something on the record to the contrary, it seems just as likely that police officers who are summoned by TSA Officials would use their own independent discretion to determine whether there are sufficient grounds to take someone into custody.

Traditionally, law enforcement officers have the discretion in deciding whether to make an arrest. *Burella v. City of Philadelphia*, 501 F.3d 134, 145 (3d Cir. 2007), (citing *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748, 761 (2005)). Police officers clearly know that they need probable cause to arrest someone and we can assume that they know they face personal liability if they arrest someone without probable cause. *See* 42 U.S.C. § 1983; *see also, e.g., Pritzker v. City of Hudson*, 26 F. Supp.2d 433, 443 (N.D. N.Y. 1998) ("Police officers are presumed to know the law governing their conduct. Reasonable police officers would know that it is a violation of well-settled constitutional rights

34

to arrest or prosecute someone absent probable cause.") (citing *Catone v. Spielman*, 149 F.3d 156, 161 (2d Cir. 1998)).

Moreover, there is a distinct and constitutionally sacrosanct demarcation between the intrusion that is inherent in an investigative detention and the kind of detention that is sufficiently intrusive to rise to the level of an arrest. For example, a *Terry* stop is an intermediate level of intrusion allowing police to conduct a limited investigation into the possibility of criminal activity based on reasonable suspicion "even though there is no probable cause to make an arrest." *Adams v. Williams,* 407 U.S. 143, 145-46 ((1972). Accordingly, without more than appears on this record, we reject George's argument that the Philadelphia Police Officers were under either the legal or functional control of the TSA Screening Officials.

Furthermore, George's allegations that the TSA Officials had either legal or functional control of the Philadelphia Police Officers cannot survive the pleading requirements established by the Court's decision in *Iqbal*. Iqbal was a Pakistani Muslim who, after the 9/11 terrorist attacks, was arrested in the United States on criminal charges and detained by Federal officials. He claimed that he was deprived of a number of constitutional protections while in Federal custody and sued a number of Federal officials, including the Attorney General and the Director of the FB1. The Attorney General and the Director of the FBI were the only Federal officials before the Court.

In his complaint, Iqbal alleged, *inter alia*, that the Attorney General and the Director of the FBI "'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest,'" that "Ashcroft was the 'principal architect' of this invidious policy," and that the Director of the FBI "was 'instrumental' in adopting and executing it." 556 U.S. at 680-81 (record citations omitted). The Attorney General and the Director of the FBI moved to dismiss, asserting that they were entitled to qualified immunity. The district court denied the motion and

the Court of Appeals for the Second Circuit affirmed. The Supreme Court granted certiorari and reversed.

After reviewing its prior decision in *Twombly*, *supra*, and analyzing the pleading standards contained in Fed.R.Civ.P. 8, the Court held that "[t]hese bare assertions . . . amount to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim" and "[a]s such are conclusory and not entitled to be assumed true." *Id.* at 681 (citations and internal quotation marks omitted).

Here, the relevant allegations in George's amended complaint are simply conclusory allegations of a Fourth Amendment violation. [21] After *Iqbal*, we can no longer assume the truth of those averments in determining whether the complaint survives a Rule 12(b)(6) challenge.

Accordingly, we reject George's contention that the TSA Screening Officials are liable for what he alleges was his unconstitutional arrest and detention by the Philadelphia Police Officers. That contention, as we have explained, is based solely on his conclusory assertions that TSA Officials had either the legal or functional control over the decisions and actions of the Philadelphia Police Officers.

We also reject George's claim that allegations about the two JTTF Agents show that they participated in his allegedly unlawful seizure, arrest and detention. Those allegations are summarized above.[22] The JTTF Agents simply responded to a call from the Philadelphia Police, questioned George for about thirty minutes, determined that he posed no security threat, and told him he was free to leave. The JTTF Agents were not at all involved in George's allegedly unconstitutional seizure, arrest and detention. Indeed, the two JTTF Agents were responsible for George's release from the alleged unconstitutional detention. Even though the JTTF agents were called to investigate a potential terrorist, and despite the fact that they knew George had been detained for over four hours because of suspicions raised by

---

[21] *See* p. 29-30*, supra.*
[22] *See* p. 27, *supra.*

his Arabic flash cards, the JTTF agents were able to determine that he posed no threat and allowed him to go on his way after spending only 30 minutes with him.

## B. George's factual allegations do not establish that any individual Federal official violated his clearly established rights under the First Amendment.

As noted, in his amended complaint, George alleged that the Federal Officials searched and questioned him in retaliation for his possession of the Arabic-English flashcards and a political book critical of American policy in the Middle East in violation of his First Amendment Rights.[23]  As also noted, the district court, in response to the Federal Officials motion for clarification, held that the amended complaint plausibly set forth a First Amendment retaliation claim.

In this portion of their appeal, the Federal Officials contend that the allegations in the amended complaint do not establish that they retaliated against George for his exercise of his First Amendment rights.[24]

---

[23] George's amended complaint also alleges that the Federal Officials arrested and incarcerated him in violation of his First Amendment rights.  However, we have already determined that the allegations in the amended complaint are insufficient to show that the Federal Officials somehow participated in, or were somehow responsible for, what George alleges was his unlawful seizure, arrest and detention by the Philadelphia Police.

[24] We are mindful of the fact that the Supreme Court has twice in recent years noted that it has not extended *Bivens* implied causes of action to First Amendment claims. *See Reichle v. Howards*, ___ U.S. ___, 132 S. Ct. 2088, 2093 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."), and *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) ("Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability to any new context or new category of defendants. . . .  Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment.  Petitioners do not press this argument, however, so we assume, without deciding, that respondent's

In order to establish a First Amendment retaliation claim, a plaintiff "must prove (1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." *Eichenlaub v. Township of Indiana*,

---

First Amendment claim is actionable under *Bivens*."). Nonetheless, despite the cautionary notes sounded by the Court, it does appear that the Court has held that there is a *Bivens* cause of action for First Amendment retaliation claims. In *Hartman v. Moore*, 547 U.S. 250 (2006), the Court wrote:

> Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right, and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions. . . for speaking out. Some official actions adverse to such a speaker might well be unexceptionable if taken on other grounds, but when nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution. When the vengeful officer is federal, he is subject to an action for damages under the authority of *Bivens*.

*Id*. at 256 (citations, internal quotation marks and brackets omitted). Thus, we will proceed on the assumption that there is a *Bivens* cause of action for First Amendment retaliation claims.

38

385 F.3d 274, 282 (3d Cir. 2004) (citations omitted). "The threshold requirement is that the plaintiff identify the protected activity that allegedly spurred the retaliation." *Id*.

It is beyond dispute that the First Amendment protects George's right to possess, read and study the flashcards and the book he was carrying. Indeed, the individual Federal Officials[25] readily concede that an airplane passenger may read whatever he or she pleases. However, the fact that George had a First Amendment right to possess, read and study the materials he possessed does not end the inquiry.

The fact that George clearly had a right to have these flash cards, does not mean that TSA Officials had to ignore their content or refrain from investigating him further because of the words they contained. The totality of circumstances here could cause a reasonable person to believe that the items George was carrying raised the possibility that he might pose a threat to airline security. That suspicion was the reason for their increased level of scrutiny during the airport screening.

The TSA Officials' suspicion was an obvious alternative explanation for their conduct, which negates any inference of retaliation. *See American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) ("Importantly, the Court held in *Iqbal*, as it had in *Twombly*, that courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s]', which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.") (citing *Iqbal*, 556 U. S. at 682).[26]

---

[25] The "individual Federal Officials" are the three TSA Screening Officers and the two FBI Agents assigned to the JTTF.

[26] Although it is too obvious to require citation, we nevertheless stress that the First Amendment will not tolerate singling someone out for enhanced scrutiny because s/he is carrying materials critical of the United States or its foreign policy. Indeed, it is fair to say that periodicals as diverse as *The Wall Street Journal* and *The Washington Post* will frequently contain articles critical of the United States and/or its foreign policy during any given administration and at any given moment in time. However, this incident survives

Moreover, because we have found that the individual Federal Officials' search and questioning of George during the screening did not violate George's Fourth Amendment rights, we are hard-pressed to find that it could result in a First Amendment retaliation claim on this record. *See Hartman v. George*, 547 U.S. 250 (2006).[27]

Accordingly, the individual Federal Officials are entitled to qualified immunity on George's First Amendment retaliation claim.

## VI. CONCLUSION

For the foregoing reasons, we hold that the Federal Officials are entitled to qualified immunity on George's Fourth and First Amendment claims. Accordingly, we will vacate the order of the district court denying their motion to dismiss and remand with instructions to grant the motion.

scrutiny under both the First and Fourth Amendment because of the flash-cards George was carrying. As we have explained, the Federal Officials acted reasonably in briefly detaining George for further investigation because of concerns that were raised by those flash-cards.

[27] In *Hartman*, the Court held that a plaintiff cannot state a claim for retaliatory prosecution in violation of the First Amendment if the charges were supported by probable cause.